Western Woodwork & Lumber Co. v. Commissioner.
Western Woodwork & Lumber Co. v. Commissioner
Docket No. 10419.
United States Tax Court
1947 Tax Ct. Memo LEXIS 211; 6 T.C.M. (CCH) 504; T.C.M. (RIA) 47124; May 9, 1947
*211 Merwyn G. Leatherman, Esq., for the petitioner. Howard M. Kohn, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The Commissioner determined deficiencies as follows: Excess
Income
Profits
Tax
Tax
1942
$3,437.94
1943
$2,240.17
1,537.72
Of the adjustments which occasioned these deficiencies the only one involved in litigation is a claimed bad debt deduction in 1943 in the amount of $10,320. The 1942 tax liability is involved, however, as a result of petitioner's claim of an unused excess profits tax credit carry-back from 1943 to 1942. The question presented is: Was petitioner entitled to a bad debt deduction in 1943 in the amount of $10,320? Findings of Fact The petitioner is a corporation organized under the laws of Ohio, having its principal office and place of business in Toledo, Ohio. It filed its income and excess profits tax returns for 1942 and 1943 with the collector of internal revenue for the tenth district of Ohio at Toledo. At all times involved herein petitioner was engaged in the business of selling lumber and the manufacturing of special millwork. In the latter *212 part of 1927 Fred J. Puck, president of petitioner, owned a lot in Toledo which he had purchased for $4,600. He made an oral proposal to one August J. Bode, a building contractor, to build a house on that lot and when the house was sold Puck was to be reimbursed in the amount of $5,750 for the lot. Bode agreed to this proposal providing petitioner would supply all the lumber and millwork and that Bode's liability to pay for the same would be limited to paying over to the petitioner said amount from the proceeds of the sale of the house when made. Bode was to be otherwise free from personal liability but was to receive whatever profits were made at the time of the sale. This agreement was approved at an informal discussion of the officers and directors of petitioner, all of whom were active in petitioner's business. No resolution was passed but all the directors were fully advised of the terms of the agreement. Early in 1928 in order to finance the cost of the building other than the lumber and millwork Bode, having procured a deed to said lot from Puck, placed a mortgage thereon in the amount of $15,000 with six per cent interest thereon. At the direction of Puck, Schick, the bookkeeper, *213 set up a separate account for this particular transaction in order not to mix it with Bode's regular account because of the contingent liability of Bode in this one transaction. The lumber and millwork furnished by petitioner was recorded in its sales and income accounts. The house, a brick veneer structure, was completed in the late summer of 1929 at a total cost of $19,302.28 which included the lumber and millwork items of $4,970. The lot was valued at $5,750, making a total valuation for the completed house of $25,052.28. Bode promptly listed the house for sale at $32,500 but received no offers. He then rented the house for undisclosed periods. In the spring of 1929 petitioner, desiring to keep its accounts receivable current and to remove Bode's special account for the accounts receivable, solicited and received from Bode a promissory note for $10,720 due in ninety days and bearing six per cent interest. This amount represented the agreed price of the lot which Puck had deeded to Bode and the cost of the materials furnished by petitioner. It was agreed by petitioner and Bode that Bode would have no liability on the note except to pay the same out of any available funds received *214 from the sale of the house. Petitioner never computed or recorded the accrual of interest on said note. Petitioner then credited its accounts receivable with $4,970 and debited notes receivable with $10,720. It also credited Puck's account with $5,750, the price of the lot which Puck had deeded to Bode. Puck subsequently received this amount in cash from petitioner. Bode persisted in his efforts to sell the property and reduced the listing to $30,000 and in 1935 he reduced the listing to $21,000 which he repeated in 1936. In 1942 he listed the property for $20,000 but at no time did he receive any offer to purchase the property until January of 1943 when he received an offer of $17,500. He accepted said offer and completed the sale of the property in 1943 at which time he considered $17,500 to be the fair market value of the property. The proceeds of the sale were applied to pay the first mortgage and interest thereon, real estate taxes, stamp taxes, and to reimburse Bode in the amount of $148.29 for expenditures made to repair plumbing which had frozen in the winter of 1942. Petitioner received nothing from the sale of this property. The value of residential real estate in *215 Toledo in 1943 was twenty per cent over that of 1940. At some time in the year 1935 Bode informed petitioner that he was ready to disclaim all hope of profit in the house and offered to deed the same to petitioner free of any claim of his. Petitioner, however, rejected this offer because at that time they considered the house with the $15,000 mortgage a liability because of "taxes, interest charges, and so on." In 1931 Bode accumulated from the rents received from the house, over the expense of operating the same, $400 which petitioner applied to the principal of Bode's note and reduced the same to $10,320. Petitioner did not credit this amount to the interest on the note. From 1929 to 1940 Toledo suffered severely from the depression and the bank holiday that occurred during those years and real estate values were exceptionally low. Some time following the sale of the property by Bode petitioner surrendered to him the note for $10,720 which he had given. Petitioner charged off this amount, less the credit of $400 received in 1931, in 1943. Opinion The evidence in this case is completely lacking as to how petitioner, in 1929, handled its receipts and disbursements concerning *216 the lot for income tax purposes. The record does not show that petitioner's income tax was increased during that year by the receipt from Bode of the promissory note, $5,750 of the face value of which was to cover the cost of the lot. The record also fails to show whether or not petitioner treated this lot transaction as a capital investment or as a sale in the regular course of business. The record does show, however, that the company was not regularly engaged in buying and selling real estate. In fact, in the entire course of its existence the only evidence introduced showed three such transactions in 1923, 1928 and 1930 and the details of those transactions are not given. It is therefore our finding that the lot transaction does not form the basis of a bad debt or loss deduction. The Commissioner in his deficiency notice gives no reason for the disallowance of the bad debt deduction in the amount of $10,320. However, in his brief he contends that the relationship between petitioner and Bode was not one of debtor and creditor, but one of a joint adventure in which the petitioner had only a contingent claim to payment out of the proceeds of the sale of the property involved in *217 the joint adventure. The Commissioner also contends that the debt, if any did not become worthless in 1943. We are unable to agree with the Commissioner that the petitioner and Bode had established between themselves a relationship of joint adventurers. There is no basis in the evidence to conclude that petitioner had any joint control over the property with Bode: In fact, Bode sold the property without the knowledge of petitioner. Furthermore, there was no provision that the petitioner should share in the profits of the venture, other than simply to be repaid for the material which it had supplied and which went into the house. Bode was to get all of the profits. On the other hand Bode was not to share in the losses. The losses were to be borne by petitioner. Because of all of these factors we do not find a basis whereon we can conclude that a joint venture existed. We are also unable to support the Commissioner's contention that petitioner's claim against Bode was not a deductible bad debt because of the contingent nature of its payment. We shall not extensively labor this point except to state that our opinion herein finds support in , *218 wherein the creditor agreed with the debtor that the creditor would receive payment only out of certain commissions arising out of employment which the creditor planned to give to the debtor. Conditions arose which prevented the debtor from rendering further service and the creditor claimed a deduction of the unpaid balance as a bad debt. The Court sustained this claim in spite of the contingent nature of the payment which was to come out of a particular fund. The Commissioner seeks to distinguish this case from the case at bar by saying the debt existed prior to the agreement of the parties in the Clay case to pay the debt out of a particular fund and in no other way. However, it is our conclusion that it is not the creation of the debt that is the basis of the question; rather it is the creation of the contingency relating to the payment thereof that questions the deductibility of the debt for income tax purposes and we deem it immaterial to the answer of that question whether the debt was antecedent to this agreement pertaining to payment or was co-existent therewith as in the case at bar. As to the Commissioner's final contention, however, that the debt involved in this case *219 became worthless prior to 1943, we are persuaded that the record sustains the Commissioner's claim. The evidence in this case shows that when the property was sold in 1943 Bode, the vendor, considered that he had received the fair market value at that time of $17,500. Q. Did you feel in 1943 when you got this offer for $17,500 that this was about the best that the current market would bring? A. Yes, sir. * * * The testimony also shows that in 1935 when real estate values in Toledo were at their lowest Bode desired to deliver the property to the petitioner and abandon any claim that he might have therein. However, petitioner rejected that offer because petitioner at that time considered the property a "liability." It had not produced any income in excess of cost of up-keep since 1931. The property was worth one-fifth more in 1943 when it was sold than it was three years before according to the testimony of Bode. Q. In other words, you would get about one-fifth more in 1943 for a piece of property than you would have gotten if you had sold it in 1940; is that right? A. Yes, sir. * * *
Q. In 1941 over 1940, say. A. Well, from 1940 to 1941 I would say it was about ten *220 to fifteen per cent increase. From all of the record in this case it is our conclusion that for some time prior to 1943 this property was not worth on the market in Toledo the amount of the mortgage thereon and that in 1940 it had a valuation of $14,000. Furthermore, in 1935 when Bode tried to get from under the property and abandon his interest and when the taxpayer refused to accept the property because it considered the property a liability, an identifiable event had occurred which established the worthlessness of petitioner's bad debt at that time. The fact that Bode continued to hold possession of the real estate does not prevent the debt, which by agreement was to be paid wholly from the proceeds of the sale, from becoming worthless when the real estate became worthless. In , the taxpayer therein claimed that she sustained a deductible loss of her interest in realty in 1937, although she continued to hold title to said realty and did not abandon it until 1940. The Tax Court had permitted the deduction and the Court of Appeals affirmed this decision. It said in part: But, we are told that "real estate always has potential *221 value and so long as a taxpayer retains title to such property he is in a position to profit from future favorable developments." Assuming the truth of this assertion with respect to an unencumbered interest in land, it cannot stand the practical or realistic test which is met when the interest is subject to superior liens or encumbrances that exceed its real value. In such a case the value of the equity is extinguished as effectually as the interest which a stockholder retains who holds title to shares in an insolvent corporation that has no reasonable expectation of recovery. In one case, as in the other, the loss has taken place and the retention of the bare legal title becomes a circumstance without significance that should not prevent the taxpayer from taking the deduction in the year in which the loss occurs or permit him to postpone it at will to some later year when it will produce a larger reduction of tax liability. It is therefore our conclusion that the bad debt which the taxpayer sought to deduct in 1943 became worthless prior to that year. Decision will be entered under Rule 50.